NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (4th) 210316-U

NO. 4-21-0316

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 28, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* S.K., a Minor | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Macon County |
| v. | ) | No. 19JA20 |
| Samantha K., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Thomas E. Little, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Knecht and Justice Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in finding respondent mother an unfit person and that termination of her parental rights would be in the minor's best interest.

¶ 2    Respondent mother, Samantha K., appeals the order terminating her parental rights to her son S.K. (born March 24, 2015). Respondent contends the trial court's decisions finding her unfit and terminating her parental rights are against the manifest weight of the evidence. We affirm.

¶ 3                              I. BACKGROUND

¶ 4    Respondent and Christopher L. are the biological parents of S.K. Christopher L. is not a party to this appeal.

¶ 5                         A. Adjudicatory Proceedings

¶ 6    In January 2019, the State filed a petition for adjudication of wardship on behalf of

S.K., alleging two counts of neglect and one count of abuse. In April 2019, the trial court entered an adjudicatory order finding the State proved by the preponderance of the evidence that S.K. was neglected in that he suffered from a lack of support, education, or remedial care (705 ILCS 405/2-3(1)(a) (West 2018)) and was in an environment injurious to his welfare when he resided with respondent (*id.* § 2-3(1)(b)). The court also found the State had proven by a preponderance of the evidence that S.K. was abused in that he was at a substantial risk of physical abuse (*id.* § 2-3(2)(ii)). These findings were based on respondent's substance abuse and possible mental health issues. S.K. was placed with his maternal grandmother, Stephanie K.

¶ 7    In May 2019, the trial court entered a dispositional order finding respondent unfit for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline S.K. due to substance abuse and mental health issues. The court further found placement of S.K. with respondent to be contrary to his health, welfare, safety, and best interest. The court placed guardianship of S.K. with the Department of Children and Family Services (DCFS). Respondent failed to appear at both the adjudicatory and dispositional hearings.

¶ 8                     B. Termination Proceedings

¶ 9                     1. *The Petition*

¶ 10    In January 2020, the State filed a petition to terminate respondent's parental rights. The State alleged she was an unfit parent on three grounds: (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to S.K.'s welfare (750 ILCS 50/1(D)(b) (West 2018)); (2) failure to make reasonable efforts to correct the conditions that were the basis for S.K.'s removal during any nine-month period following the adjudication of neglect and abuse (*id.* § 1(D)(m)(i)); and (3) failure to make reasonable progress toward the return of S.K. during any

nine-month period following the adjudication of neglect and abuse, specifically between April 11, 2019, and January 11, 2020 (*id.* § 1(D)(m)(ii)).

¶ 11                                     2. *The Fitness Hearing*

¶ 12          In February 2021, the trial court conducted the fitness hearing. The relevant evidence is summarized as follows.

¶ 13                          a. Testimony of Amanda Beasley-Ricks

¶ 14          Amanda Beasley-Ricks, the director of foster care at Webster Cantrell Youth Advocacy (Webster Cantrell) and the supervisor of caseworker Shawna Spence, testified her agency received the case in February 2019. (According to a prehearing discussion, Spence was unavailable to testify, as she was on a medical leave of absence. As a result, respondent's counsel made a continuing hearsay objection during Beasley-Ricks's testimony.)

¶ 15          Beasley-Ricks testified the first contact she had with respondent was on July 2, 2019, when respondent came to their office, stating she wanted to begin services. She was upset and stated she was ready to "get herself clean." Respondent was to engage in parenting classes, a substance abuse assessment (including random drug screens), a mental health assessment, and domestic violence services. These tasks were recommended without the benefit of an integrated assessment due to the unknown whereabouts of respondent until July 2019.

¶ 16          At the July 2, 2019, meeting, respondent signed releases for Prevention and Treatment Services (PATS), Heritage Behavioral Health Center, and New Life Pregnancy Center and the corresponding referrals were made on July 2, 2019, and July 3, 2019. When the case plan was evaluated in January 2020, respondent's progress was rated unsatisfactory "[a]cross the board." Respondent had not completed any services and failed to participate in drug screens.

¶ 17        On cross-examination, Beasley-Ricks testified that in December 2020, she learned respondent had allegedly (1) participated in substance abuse treatment at Crossings Healthcare (Crossings) beginning in August 2019, (2) completed a four-hour online parenting course, and (3) completed several drug screens at Crossings. Beasley-Ricks acknowledged respondent's counsel had provided these things to her but, since there had been no executed release for those services, Beasley-Ricks was unable to verify the information. She also testified the online parenting course was not approved. The agency's recommended parenting course was a "more in-depth class," spanning six to eight weeks for two hours each, where her attendance could be verified.

¶ 18                        b. Testimony of Respondent

¶ 19        Respondent explained, in October 2018, her grandmother was killed in an automobile accident while on her way from Florida to visit respondent and S.K. While grieving, respondent resorted to drugs as her coping mechanism. She said she knew it was a mistake and she was now "doing everything [she could] to correct that." Respondent said when she realized she had a problem with drugs, she voluntarily placed S.K. in her mother's care. Shortly thereafter, this case was initiated.

¶ 20        After respondent's meeting at Webster Cantrell on July 2, 2019, she admitted herself into inpatient rehabilitation services at Rosecrance in Rockford, Illinois. When she told Spence she had checked in, Spence said Rockford was too far to accommodate visits with S.K. Spence told respondent to go to Heritage Behavioral Health Center (Heritage), in Decatur, Illinois, for treatment. Respondent left inpatient services at Rosecrance and enrolled in a Rosecrance outpatient facility in Champaign. Spence told respondent she still needed to go to Heritage for an

assessment.

¶ 21 Counsel introduced as an exhibit, respondent's June 5, 2019, treatment plan from Heritage. At some point, respondent was referred to Crossings for the medically assisted treatment program (MAT). Respondent testified she presented a letter from her physician regarding MAT to Spence. (However, Beasley-Ricks testified her agency was unaware until December 2020 that respondent was allegedly attending treatment at Crossings.)

¶ 22 Respondent testified she received a copy of her service plan on July 2, 2019, and understood the required services. According to respondent, the specific providers of those services were not listed. She recalled asking Spence numerous times about specific locations for services but received no answer. In the meantime, she continued treatment at Crossings from June 2019 through January 2020. She also said she had submitted drug screens, missing none.

¶ 23 Respondent testified she enrolled in online parenting classes through "lifematters.com" because she was not able to contact Spence. She said the only thing she knew to do was to look online for a class. She "figured that would be better than nothing as far as a parenting class."

¶ 24 Respondent said after waiting a few weeks in July 2019, she went to the Youth Advocacy office because Spence had told her the referrals would be there. She said the office did not know respondent and had no information for her. Once Youth Advocacy was "absorbed by" Webster Cantrell, respondent went to the Webster Cantrell office looking for the referrals, to no avail.

¶ 25 Respondent said she found PATS through Google by searching "domestic violence class and parenting class." She went into the PATS office sometime after January 2020, to inquire

- 5 -

about referrals. Respondent's counselor, Leila Ray, found a referral "from all the way back in July."

¶ 26    Although she did not recall when, respondent said that at some point, she was diagnosed with bipolar disorder and depression and, as a result, either in 2019 or 2020, she was issued a medical marijuana card. She advised Spence of the same "probably" sometime in 2020.

¶ 27    On cross-examination, counsel handed respondent a list of service providers, with the providers' telephone numbers, dated January 28, 2019, and asked respondent to identify her signature at the bottom. She acknowledged she had signed this document on July 2, 2019.

¶ 28                    3. *Trial Court's Fitness Determination*

¶ 29    On March 1, 2021, after taking the matter under advisement, the trial court entered a written order finding respondent unfit. The court found that, although respondent's testimony about the difficulty communicating with Spence was "to some degree[ ] corroborated by other evidence in the record," "that difficulty did not rise to the level of preventing [respondent] from reasonable compliance with the service plan." The court noted Beasley-Ricks's testimony that she was present when the referrals were discussed with respondent, and those referrals were made to the necessary service providers. The court specifically found the testimony of Beasley-Ricks credible and the testimony of respondent "incredible." As a result, the court found the State had proved by clear and convincing evidence that respondent was an unfit parent for the reasons set forth in the State's petition.

¶ 30                    4. *The Best-Interests Hearing*

¶ 31    On May 5, 2021, the trial court conducted a best-interest hearing where the following evidence was presented.

¶ 32                                    a. Testimony of Amanda Beasley-Ricks

¶ 33            Beasley-Ricks testified she had prepared a best-interest report in preparation for the hearing. She said S.K., who was six years old, had been with his maternal grandmother, Stephanie K., since January 28, 2019, and was in a prospective adoptive placement. She said S.K. was doing very well and was very happy. He was "very, very bonded" to his grandmother and saw the placement as "home." All his basic needs were being met. Stephanie chose to enroll him in a private school where he was doing very well.

¶ 34            Beasley-Ricks testified that "[b]ased upon the nine[-]month time frame," she would recommend termination of respondent's parental rights and a goal change to adoption.

¶ 35                                    b. Testimony of Respondent

¶ 36            Respondent testified she had completed all services and wanted the opportunity to parent S.K. now that she was a "better mother for [her] son."

¶ 37                                    c. Testimony of Foster Mother

¶ 38            Stephanie K., respondent's mother, testified S.K. had lived with her since January 2019. Prior to DCFS involvement, she would care for S.K. two to three days a week. She enrolled S.K. in pre-kindergarten classes in August 2019 at Decatur Christian School based upon the school's Christian values and curriculum. He was in kindergarten at the school and had made several friends. Stephanie said she and her partner of 10 years, Rob, enjoyed various outdoor activities with S.K.

¶ 39            Stephanie testified her home provided "loving structure" for S.K. and he was doing very well. She was prepared to provide S.K. with permanent placement should respondent's parental rights be terminated.

¶ 40                              d. Trial Court's Decision

¶ 41        After considering the evidence and arguments of counsel, the trial court announced its ruling in open court. The court identified the following as relevant statutory factors in making its best-interest determination: (1) the "child's sense [of] attachment, where this child actually feels love, attachment, and a sense of being valued"; (2) his "sense of security"; (3) his "sense of familiarity and continuity"; (4) the least disruptive placement alternative for the child, (5) his need for permanence and stability, and (6) the continuity of relationships with parent figures, siblings, and other relatives.

¶ 42        The trial court noted, according to the best-interest report, S.K. was thriving, doing well in school, bonded with his grandmother, and enjoying the family's activities. Given the evidence supporting the factors and the fact S.K. had been in this "secure, stable environment" for over two years, the court found the State had carried its burden by a preponderance of the evidence in proving termination of respondent's parental rights was in S.K.'s best interest.

¶ 43        This appeal followed.

¶ 44                              II. ANALYSIS

¶ 45                              A. Fitness Finding

¶ 46        Section 2-29 of the Juvenile Court Act of 1987 (705 ILCS 405/2-29(2) (West 2018)) "sets forth a two-step process for the involuntary termination of parental rights." *In re M.I.*, 2016 IL 120232, ¶ 20. First, the trial court must find, by clear and convincing evidence, that "[the] parent is an unfit person as defined in Section 1 of the Adoption Act [(750 ILCS 50/1(D) (West 2018))]." 705 ILCS 405/2-29(2) (West 2018).

¶ 47        "A reviewing court accords great deference to a trial court's finding of parental

unfitness, and such a finding will not be disturbed on appeal unless it is against the manifest weight of the evidence." *In re M.C.*, 2018 IL App (4th) 180144, ¶ 22. "A court's decision regarding a parent's fitness is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent." (Internal quotation marks omitted.) *Id.*

¶ 48    Following the fitness hearing, the trial court determined respondent was an unfit person based upon the three grounds alleged by the State. However, to affirm the court's judgment, we need only find that the State sufficiently established respondent was an unfit person on a single ground. See *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 30 ("As the grounds for finding unfitness are independent, we may affirm the trial court's judgment if the evidence supports it on any one of the grounds alleged."). Here, we find the trial court's determination that the State proved respondent was an unfit person under section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2018)) was not against the manifest weight of the evidence.

¶ 49    Section 1(D)(m)(ii) of the Adoption Act states that a parent is an unfit person if she fails to "make reasonable progress toward the return of the child to [her] during any 9-month period following the adjudication of neglect[ ] or abuse[ ] *** under Section 2-3 of the Juvenile Court Act of 1987." *Id.* § 1(D)(m)(ii). We have previously determined that:

> " 'Reasonable progress' is an objective standard which exists when the court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will*

*have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original and internal quotation marks omitted.) *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 51.

¶ 50        Further, reasonable progress is measured by a parent's "compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." (Internal quotation marks omitted.) *Id.* ¶ 50. Finally, "in determining whether a parent has made reasonable progress toward the return of the child, courts are to consider evidence occurring only during the relevant nine-month period mandated in section 1(D)(m)." *In re J.L.*, 236 Ill. 2d 329, 341 (2010). That is, the trial court is not permitted to consider any evidence outside the nine-month period dictated by statute (*id.*) and designated in the petition to terminate.

¶ 51        Here, the trial court found respondent failed to make reasonable progress toward the return of S.K. from April 11, 2019, through January 11, 2020. The evidence presented at the fitness hearing demonstrated that respondent was unable to be located until July 2, 2019. On that date, she received all the information needed from the agency to begin services. She received a copy of her service plan and a list of service providers with telephone numbers. She was told what services she needed to complete and was advised to cooperate with the agency. She signed consents for the release of information and understood what was required of her. Nevertheless, when the case plan was reviewed in January 2020, her progress was rated overall unsatisfactory, as she had completed no services. Given this evidence, at no point during the relevant period was the minor close to being returned to respondent's care.

¶ 52 Respondent presented evidence she had indeed engaged in services with other providers and had difficulty communicating with Spence, her caseworker. Not only did the trial court find her testimony unbelievable but, it appeared most, if not all, of those services were completed after the relevant nine-month time frame and after the petition to terminate had been filed.

¶ 53 The trial court found Beasley-Ricks's testimony credible. She testified that (1) she was present when referrals were discussed with respondent, (2) the referrals were made to the necessary service providers, (3) the online parenting course was not acceptable under the agency's standards, (4) she had no knowledge of respondent receiving treatment at Crossings, and (5) she had not received any notice of completed services from respondent until December 2020.

¶ 54 Based upon the evidence presented at the fitness hearing and the trial court's noted credibility determinations, we cannot say, considering the deference accorded to the court's decision, that the court's finding respondent an unfit person was against the manifest weight of the evidence.

¶ 55                                B. Best-Interest Finding

¶ 56 Upon a finding of parental unfitness, a hearing on a child's best interest will be held. At the best-interest hearing, the trial court's focus shifts to the child's interest in securing "a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). When a best-interest decision must be made, the court shall consider factors listed in section 1-3 of the Juvenile Court Act of 1987 (705 ILCS 405/1-3(4.05) (West 2018)). These factors include the child's physical safety and welfare, the development of the child's identity, the child's background and ties, the child's sense of attachments including the sense of security, familiarity, and continuity of affection, the child's

wishes and long-term goals, and the preferences of those available to care for the child. *Id.* A parent's wishes to continue her relationship with her child yields to the child's interests. *D.T.*, 212 Ill. 2d at 364.

¶ 57        The trial court may terminate parental rights only upon finding the State proved, by a preponderance of the evidence, the termination of those rights is in the child's best interest. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009). We will not disturb a best-interest determination unless it is against the manifest weight of the evidence. *Id.* A best-interest determination is against the manifest weight of the evidence only if it is clearly evident the State failed to carry its burden of proof or, in other words, if the finding is " 'unreasonable, arbitrary, or not based on the evidence presented.' " *In re J.H.*, 2020 IL App (4th) 200150, ¶ 85 (quoting *In re B.B.*, 386 Ill. App. 3d 686, 697-98 (2008)).

¶ 58        Upon reviewing the trial court's decision and the record, we find the trial court's best-interest determination is not against the manifest weight of the evidence. The court expressly considered the statutory factors of section 1-3(4.05) (705 ILCS 405/1-3(4.05) (West 2018)). While respondent testified to a bond she shared with her son and the progress she had made to become a "better mother," the record showed S.K. was thriving in his family placement. The evidence established S.K. (1) shared a strong bond with his grandmother/foster mother, (2) was doing well in school, (3) enjoyed various activities with family and friends, and (4) was in a potential adoptive placement. Given this evidence, we find the trial court's decision to terminate parental rights was not unreasonable, arbitrary, or contrary to the manifest weight of the evidence.

¶ 59                                III. CONCLUSION

¶ 60        We affirm the trial court's judgment.

¶ 61            Affirmed.